UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TINA L. RUSSO, ) | |
| ) | |
| Plaintiff, ) | No. 09 C 07739 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| MIDLAND PAPER COMPANY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

In October 2007, Tina Russo, an Accounts Receivable Supervisor at Midland Paper Company, told her supervisor that she was pregnant. R. 18 ¶ 26.[1] Russo went on pregnancy leave on January 1, 2008 and gave birth to her son in April 2008. *Id.* ¶¶ 22-25. Later that month, she learned that her employment with Midland was terminated. *Id.* ¶ 50. Russo filed this lawsuit, alleging that the termination constituted discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act. R. 1. Midland has moved for summary judgment. R. 17. For the reasons discussed below, the Court grants Midland's motion for summary judgment because Russo has not presented sufficient evidence to raise a genuine issue on whether the relevant Midland decision-makers discriminated against her.

---

[1] Citation to the docket is "R." followed by the entry number and, when necessary, the page/paragraph number.

**I.**

Because this opinion address Midland's summary judgment motion, the Court states the facts in the light most favorable to Russo (as the non-movant) and makes reasonable inferences in her favor. Tina Russo was hired by Midland Paper Company in February 2000 as a credit and collection representative. R. 18 ¶ 5. In 2005, she was promoted to the Accounts Receivable Supervisor position. *Id.* ¶ 6. Russo's job duties as an Accounts Receivable Supervisor included overseeing two major accounts, serving as the Midland Bank Credit bank liaison, and supervising two credit clerks. *Id.* ¶ 7. Her supervisory duties were not a large part of her overall responsibilities; they took up just 5-10% of her time. R. 23 ¶ 25.

As a Midland employee, Russo had a mixed performance record. Russo's performance review from August 2005-06 identified several areas for improvement, and the review included some critical remarks regarding her work product, attitude, and responsiveness to emails. R. 18 ¶ 9. Her performance review from August 2006-07 – the last one she received before being fired – included three recommendations for areas of improvement. *Id.* ¶ 10. Throughout 2007, Russo also received reprimands and warnings based on her "not acceptable attitude" and improper adjustments of accounts. *Id.* ¶¶ 11-13. One of her Employee Warning Reports stated that "further occurrences may result in termination." *Id.* ¶ 14.

Despite receiving some criticism for her work performance, Russo received two annual merit-based pay increases during the same time period. Her August 2005-06 review included positive comments and she received a pay raise shortly afterwards. R.

2

23 ¶ 15. Her August 2006-07 review the next year was also followed by a pay raise. *Id.* ¶ 16. Around the time she received this second raise, Russo informed Midland's Human Resources Department that she was pregnant. *Id.* ¶ 17. This was her third pregnancy while working at Midland.[2] R. 18 ¶¶ 16-25. Russo then told Mari Fontana – her direct supervisor – that she was pregnant. *Id.* ¶ 26. According to Russo, Fontana replied, "are you f–ing kidding me?" R. 23 ¶ 17. Fontana admits that she reacted with surprise but denies making this statement or using an expletive. R. 18 ¶ 26. Russo, on the other hand, did not think that Fontana seemed shocked or surprised. R. 23 ¶ 17. After this exchange, Russo felt that Fontana began to act "cold" and "distant." *Id.* ¶ 18.

Russo also noticed that other Midland employees began to act cold towards her. During a business trip to Minnesota in November 2007, Russo told two Midland employees, John Johnson (who was the General Manager of Midland's Minneapolis Division) and Judy Aleksiak (who was Vice President of Operations), that she was pregnant. *Id.* ¶ 19. The two employees were not in Russo's supervisory chain. R. 18, Exh. 16 ¶ 3. (As explained below, neither Johnson nor Aleksiak were actually involved in the decision to fire Russo.) According to Russo, Johnson responded by asking, "What are we going to do with you on leave?" and Aleksiak responded by asking, "Don't you know what causes this?" R. 23 ¶ 19. After returning from the trip, Russo told Ralph DeLetto – Midland's Vice President and CFO – that she could no longer travel to

---

[2] In 2001, she took a fourteen-week pregnancy leave and in 2003, she took a twenty-two week pregnancy leave. R. 18 ¶¶ 16-17.

Minnesota. *Id.* ¶ 20. From that point on, Russo felt that her relationship with DeLetto deteriorated because he also became cold and distant. R. 18, Exh. 1 at 112.

On December 27, 2007, Russo told Human Resources Representative Nikki Facchini that she would need additional leave due to medical complications with the pregnancy. R. 23 ¶ 21. Russo told Facchini that she would begin medical leave on January 1. *Id.* Facchini responded by telling Russo that she was required to return to work eight weeks after the birth of her child and that if she did not, her job would be in jeopardy.[3] *Id.* ¶ 23.

On January 1, 2008, Russo began her medical leave. R. 18 ¶ 22. While out on leave, Russo had two interactions with Midland employees. In February 2008, Russo attended a Midland Credit Department dinner, where she felt like she was treated with "cold indifference and disdain." R. 23 ¶ 29. On another occasion, Russo had trouble connecting to her work e-mail so she contacted Fontana for help. *Id.* ¶ 30. According to Russo, Fontana was unhelpful and responded by simply saying "oh really." *Id.*

While Russo was out on leave, Fontana and Midland CFO DeLetto discussed how to cope with Russo's absence. R. 18 ¶ 34. They agreed that Nicholas Rog – a Credit Analyst who was on probationary status – would take over Russo's two major accounts. *Id.*; R. 23 ¶ 26. Fontana would shoulder Russo's supervisory responsibilities. R. 18 ¶ 36. Richard Fey, another Midland employee, would take over Russo's bank liaison role

---

[3] Facchini also expressed concern to DeLetto that calculating Russo's additional vacation and sick/personal time would be a problem if "she does not return to work." R. 23 ¶ 21.

and another account. *Id.* Cindy Patrick, one of Russo's peers in the department, would also take over an account. *Id.*

Soon, Fontana realized that the Credit Department staff was able to absorb all of Russo's job responsibilities with little trouble. *Id.* ¶ 47. Fontana also noted that the recession was seriously impacting Midland's business performance. *Id.* These two factors led her to believe that the Accounts Receivable Supervisor position was redundant and unnecessary. *Id.* Fontana recommended that DeLetto (the company's CFO) fire Russo. *Id.* ¶ 48. DeLetto approved, and on April 22, 2008, Midland fired Russo.[4] *Id.* ¶ 49.

After finishing the required EEOC process, Russo filed a complaint alleging violations of Title VII and the Pregnancy Discrimination Act. R. 1. Midland has moved for summary judgment, R.16, and the motion is now fully briefed.

## II.

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372,

---

[4] Fontana prepared a separation report that explained that Russo was fired as part of a "Reduction in Force." R.24, Exh. S.

5

380 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

### III.

Under Title VII, it is unlawful for employers "to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The phrase "because of sex" has been defined by the Pregnancy Discrimination Act (PDA), through which Congress amended Title VII in 1978, to mean "because of or on the basis of pregnancy, childbirth, or related medical conditions." *Venturelli v. ARC Community Services, Inc.*, 350 F.3d 592, 598 (7th Cir. 2003) (citing 42 U.S.C. § 2000e(k)). To respond to the summary judgment motion, Russo may proceed by either the direct or the indirect method. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

### A.

Under the direct method, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Direct evidence "essentially requires an

admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* These admissions are rare, and Russo has not presented any direct evidence of discrimination by Midland's decision-makers. The second type of evidence permitted under the direct method is circumstantial evidence, or evidence that allows a jury to infer intentional discrimination. *Id.*

Without putting too fine a point on rigid categories, there are generally three types of circumstantial evidence, each of which is enough by itself to defeat summary judgment. *Serednyj v. Beverly Healthcare LCC*, – F.3d –, 2011 WL 3800123 (7th Cir. Aug. 26, 2011). The first includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736 (citing *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424 (7th Cir. 1992)). The second is evidence that "employees similarly situated to the plaintiff other than [her pregnancy] received systematically better treatment." *Id.* (citing *American Nurses' Ass'n v. Illinois*, 783 F.2d 716, 728 (7th Cir.1986)). The third is evidence that the "plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)). Although Russo argues that she has all three types of circumstantial evidence, for now the Court will only address arguments related to evidence in the first category;

the other two categories of circumstantial evidence – similarly situated individuals and pretext – will be discussed in the indirect method section below (even when all the circumstantial evidence is considered together, Russo has not raised a genuine issue for trial).

Russo presents a series of statements and behaviors she believes create a mosaic of circumstantial evidence of discrimination. When an "ambiguous comment is made with a tone of sarcasm or enmity, a court may attribute greater weight to an alleged discriminatory inference." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 735 (7th Cir. 2011). Yet stray workplace remarks "cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question." *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) (citing *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686-87 (7th Cir. 1991)). If the remark was made long before the firing, the plaintiff must show that it was related to the decision to discharge. *E.g., Geier v. Medtronic*, 99 F.3d 238, 242 (7th. Cir. 1996) (requiring a casual nexus between remark and firing).

The first statement Russo presents is Fontana's reaction (Fontana was Russo's direct supervisor) when Fontana first heard about the pregnancy. According to Russo, Fontana exclaimed, "are you f–ing kidding me?" R. 23 ¶ 17. Fontana denies making this statement. R. 18 ¶ 26. Fontana's statement and the use of an expletive – if true – does suggest a generally negative tone. But, even viewing reasonable inferences in her favor, Russo has not shown that this statement reflects discrimination *related* to her firing. Fontana made the statement in October 2007, six months before Russo was

fired. R. 23 ¶ 17. Russo has not presented any evidence that this solitary statement was related to the decision. The relevance of the remark is further weakened by its ambiguity, which could be an expression of surprise because, according to Fontana and undisputed by Russo, Russo had previously told Fontana that Russo was thinking about having her "tubes tied" to prevent another pregnancy. R. 18 ¶ 26. And while the use of an expletive in this situation may be inappropriate, rude, or offensive, it was not discriminatory. *Geier*, 99 F.3d at 242 ("The comment, while awkward, insensitive and ungenerous, does not rise to the level of direct evidence of discrimination.").

Russo also presents other statements that were made to her that she believes were discriminatory. In November 2007, Russo was in Minnesota for work when she told John Johnson and Judy Aleksiak – two Midland employees – that she was pregnant. R. 23 ¶ 19. Johnson responded by asking, "What are we going to do with you on leave?" and Aleksiak asked, "Don't you know what causes this?" *Id*. But there is no evidence that either Johnson or Aleksiak who had any say whatsoever in the firing decision. *E.g., Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) ("Any examples of allegedly discriminatory treatment by coworkers is wholly irrelevant to the mosaic [of circumstantial evidence], as his coworkers had nothing to do with the decision to terminate his employment.").

Another set of statements relied on by Russo was made by a human resources employee. In late December 2007, Russo told Human Resources Representative Facchini that she would require medical leave due to pregnancy complications. R. 23 ¶ 21. According to Russo, Facchini made two statements that suggest discrimination.

9

First, Facchini discussed with CFO DeLetto the possibility of Russo not returning to work after her leave. *Id.* ¶ 21. Russo believes this means Midland anticipated firing her. But Russo offers no evidence that the discussion was anything other than a discussion about, as Russo herself puts it, Facchini's concern about "paying Russo additional vacation and sick/personal time 'if she does not return to work.'" *Id.*

Second, Facchini said Russo had to return to work eight weeks after the birth of her child, despite the fact that Russo was entitled to twelve weeks. *Id.* ¶ 23. Russo believes this amounts to Midland pressuring her to quit. To be sure, when viewed in the light most favorable to Russo, a jury could reasonably rely on Facchini's admonition that Russo must return within eight weeks suggests that Facchini intended to apply pressure on Russo to quit. Indeed, Midland admits that Russo was entitled to twelve weeks of unpaid medical leave in addition to her pregnancy leave. R. 18 ¶ 21. But Russo cannot rely on this statement by Facchini to show a discriminatory basis for the firing because there is no evidence that Facchini was involved in the discharge decision. "[A]ctions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir.1989). Facchini worked in the human resources department, but she was not in Russo's supervisory chain, and Russo presents no evidence showing that Facchini was otherwise involved in the decision to fire her. Facchni's statements (and her potential discriminatory intent) thus cannot be imputed to the actual decision-makers or to Midland. R. 18 ¶ 19.

10

Next, Russo points to Midland employees treating her with coldness and disdain as circumstantial evidence of improper discrimination. For example, on a particular day when she was away on leave, Russo had trouble accessing her e-mail. *Id.* ¶ 30. When she asked Fontana for help, Fontana simply responded, "oh, really." *Id.* Russo also claims that she was treated coldly by her colleagues and superiors at a Midland Credit Analyst social dinner. *Id.* ¶ 29.

But none of these statements or behaviors contribute much, if anything, to the mosaic of discrimination. "[U]nfriendly glances and other subtle indicia of distaste generally fall short of establishing discrimination under [the direct method]." *Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010). Fontana's terse response and Russo's feeling that her colleagues were being "cold" to her are not enough to support an inference of discrimination.

And finally, Russo maintains that Midland's decision to rely on Nicholas Rog to take over Russo's job duties is evidence of discriminatory intent. First, Russo argues that Midland anticipated firing Russo because Rog was hired immediately after Midland learned about the pregnancy. R. 25 at 9. But Midland had planned to hire a Credit Analyst in mid-September, well before Russo informed Midland about her pregnancy. R. 18 ¶ 40. And Rog was hired specifically to work on the Rockford account – which was not one of Russo's responsibilities. R. 18, Rog Dep. Tr. at 17:21 – 18:4. Second, Russo identifies the term "personnel change" in Rog's December 2008 performance review to suggest that Midland had hired Rog in anticipation of firing Russo. R.23 ¶ 27. But that argument is unpersuasive because Rog's review was written

11

in October 2008 – six months *after* Russo was fired. R. 28 at 6. The phrase "personnel change" may have referred to Russo's firing, but Russo fails to connect that term with any discriminatory intent by Midland. In summary, Russo's has not raised a genuine issue using the direct method.

**B.**

Under the indirect method, the plaintiff must first demonstrate a prima facie case of discrimination. To show a prima facie case of pregnancy discrimination, she must show that (1) she was a member of a protected class, (2) that she suffered an adverse employment action, (3) that she was performing her job satisfactorily, and (4) that a similarly situated individual outside her protected class was treated more favorably. *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 907 (7th Cir. 2010). If the plaintiff can show a prima facie case, the employer must produce a non-discriminatory reason for the adverse employment action. *Id.* If the employer makes such a showing, the plaintiff must then produce evidence that the proffered reason is pretextual. *Id.* The parties do not dispute that the first two requirements of the prima facie case are met, so the Court will address the other two elements.

Russo insists that she met Midland's legitimate expectations because she had a history of favorable performance reviews and merit salary increases. R. 25 at 12. According to Russo, her October 2007 review contained mostly positive comments, and she received a 3.9% merit-based salary increase.[5] R. 23 ¶ 16. This was the second year

---

[5]In her Statement of Facts, Russo explains that she received a favorable verbal performance evaluation and states that she "never received a written performance evaluation."

in a row where Midland awarded her a pay raise. *Id.* ¶ 15. To the extent that she received criticisms for her work, Russo argues, other employees received even harsher criticisms. R. 25 at 11-12. Midland makes a half-hearted counter-argument by claiming that these other employees were not comparable. R. 28 at 9. Midland does, however, concede in a footnote that Russo did meet its legitimate expectations. *Id.* at 9 n. 5 ("To be clear, Midland has never stated that Russo was terminated for poor performance. Her job was eliminated because it no longer served a business purpose."). Thus, the truly disputed issue is the final requirement for the prima facie case: whether similarly situated employees were treated more favorably.

Employees are similarly situated to the plaintiff if they are "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Russo does not present a list similarly situated employees, but instead makes two separate arguments.

Russo's first argument is that Midland departed from its usual practice when it fired Russo but did not first fire four comparatively junior non-pregnant employees – Dan Strobel, John Edgerton, Tonya Lynn, and Cynthia Patrick. R.25 at 7-8, 13. Russo believes that Midland's standard practice was to lay off employees based on seniority. Accordingly, Russo argues that she was treated worse than these four employees because they should have been fired first. *Id.* at 8. Midland counters by arguing that there was never any seniority-based layoff policy. R. 28 at 8. Instead,

---

R. 23 ¶ 17. But Midland has furnished a copy of the written performance review, which does reflect, as it turns out, generally positive comments. R.18, Exh. 5.

Russo was terminated after Midland discovered that other employees could absorb her job responsibilities. *Id.*

Russo's argument is unpersuasive. The four listed employees were unlike Russo because they were not supervisors. R. 25 at 8, 13; R. 28 at 9. Although a plaintiff need not show complete identity with a proposed comparator, she must show substantial similarity. *Serednyj v. Beverly Healthcare,* LLC, – F.3d –, 2011 WL 3800123, at *8 (7th Cir. Aug. 26, 2011). Russo has presented no evidence that these four employees had any managerial role. Moreover, Russo supplies no evidence that Midland's standard practice was to conduct layoffs based on seniority – she only cites two other rounds of layoffs that were decided by seniority. R. 25 at 7.

Russo's second argument is that she was fired as part of a "mini-RIF"so she is not required to present similarly situated employees. R.25 at 13. A mini-RIF is when the fired employee's duties are not eliminated but instead absorbed by other employees not in the protected class. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000). A plaintiff, in a single-discharge case where duties are absorbed by other employees, does not need to show that similarly situated employees were treated better because an inference of discrimination arises from the fact that the plaintiff was constructively "replaced" by workers outside of the protected class. *Id.* at 495. Russo lists all the employees who absorbed her duties and argues that not a single one of them was pregnant and therefore she can make her case as a mini-RIF. R. 25 at 13-14.

Midland counters by first arguing a legal issue: that the mini-RIF framework does not apply here because it requires that the job that the plaintiff held was unique.

14

R.17 at 9-10 n. 4 (citing *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000)). This argument is unpersuasive. In *Michas*, the Seventh Circuit did not hold that having a unique job was a requirement to applying a mini-RIF analysis. Instead, *Michas* explained that when an employee with a unique job is fired, the mini-RIF analysis is automatically triggered.[6] *Id*. In other words, having a unique job is *sufficient* by itself to trigger a mini-RIF analysis (and dispensing with showing similarly situated employees), but a unique job is not *necessary* to enable the mini-RIF approach.

A mini-RIF did occur here. Although Midland eliminated the position of Accounts Receivable Supervisor, it did not eliminate Russo's job responsibilities. Instead, other Midland employees – Rog, Fontana, Fey, and Patrick – took on those duties. R. 23 ¶ 26; R. 18 ¶ 36. These four employees were not in the protected class because they were not pregnant and collectively, they replaced Russo. "The point of the mini-RIF . . . is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively replaced . . . ." *Bellaver*, 200 F.3d at 495. Thus, Russo has established all four elements of the prima facie case.

Once a plaintiff has presented a prima facie case of discrimination, the burden shifts to the defendant to show that there was a legitimate, non-discriminatory reason

---

[6]"Because of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job, we have dispensed with the requirement that the plaintiff show 'similarly situated' employees who were treated more favorably." *Michas*, 209 F.3d at 693.

for the adverse employment action. *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005 (7th Cir. 2001). If the defendant can make such a showing, the plaintiff must show – by a preponderance of the evidence – that the proffered evidence was pretext for intentional discrimination.[7] *Id.*

According to Midland, after Russo went on leave, Fontana and DeLetto attempted to redistribute her job duties to other employees. R. 18 ¶ 34. Midland soon discovered that it could operate just as well without Russo. *Id.*¶ 47. That discovery, combined with Midland's view that its business was being affected by the weak economy, led Fontana and DeLetto to decide to eliminate Russo's position. *Id.*

Once Midland has presented a legitimate, non-discriminatory reason for the termination, the burden shifts to Russo to establish that the articulated reason is pretext for discrimination. *Clay*, 253 F.3d at 1005. To show pretext, Russo must demonstrate that the proffered reason was "a lie or completely lacks a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). Russo cannot merely argue that the presented reasons were mistaken, ill-considered, or foolish. *Id.* To show pretext, the proffered reason must be dishonest. *O'Connor v. Depaul University*, 123 F.3d 665, 671 (7th Cir. 1997).

According to Russo, Midland did not fire Russo for genuine business reasons. R. 25 at 14. Russo maintains that her responsibilities as an Accounts Receivable Supervisor were generally the same as other credit analysts who were *not* terminated.

---

[7]Russo first argues that Midland has presented no legitimate, non-discriminatory reason. R. 25 at 14. But Midland has, in fact, provided an explanation. R. 17 at 12-14.

*Id.* Thus, according to Russo, Midland must have singled her out for termination and the "business reasons" explanation is pretext for discrimination. *Id.*

But Russo does not address Midland's explanation that, during Russo's leave (when her duties had to be re-distributed), the company discovered that it could operate without someone in Russo's job. None of the other credit analysts gave Midland the chance to make a similar discovery about their job duties because none of them took leave for three months. Russo presents no evidence suggesting that Midland's business analysis was dishonest. And because Russo has not met her burden of establishing pretext, she cannot prevail under the indirect method.

## IV.

For the reasons stated above, Defendant's motion for summary judgment [R. 16] is granted.[8]

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: October 21, 2011

---

[8] Russo seems to contend that she has alleged a sex discrimination claim separate from the pregnancy discrimination claim, but the complaint does not read that way. In any event, Russo has presented no evidence that Midland discriminated against her based on sex, separate and apart from the pregnancy discrimination claim. Having said that, the Court will entertain a motion to reconsider if Russo wishes to present facts supporting an independent sex discrimination claim and can justify why those facts were not presented earlier.